# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| RAPHAEL MORALES, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:09-CV-713 (JCH) |
| v. | : | |
| | : | |
| TOWN OF GLASTONBURY, ET AL. | : | JANUARY 17, 2012 |
| Defendants. | : | |
| | : | |

## RULING RE:
## MOTIONS FOR SUMMARY JUDGMENT (Docs. No. 123, 136)

## I.    INTRODUCTION

Plaintiff, Rafael Morales, brings this action against the Town of Glastonbury, Chief Thomas J. Sweeney, Officer Corey Davis, the Town of Manchester, Chief James Berry, Sergeant Marc Hughes, Officer Daniel Bontempo, Officer Steven Koss, the Town of South Windsor, Chief Gary T. Tyler, and Officer David Gesualdi.[1]  Morales alleges that defendant officers and towns deprived him of his rights under the Fourth Amendment in violation of 42 U.S.C. § 1983, and of his rights under the Connecticut Constitution, Article First, and committed common law torts against him.

Pending before the court are two Motions for Summary Judgment.  Defendants Town of Glastonbury, Chief Thomas J. Sweeney, Officer Corey Davis, Town of South Windsor, Chief Gary T. Tyler, and Officer David Gesualdi move for summary judgment as to all claims (Doc. No. 123).  Defendants Town of Manchester, Chief James Berry, Sergeant Marc Hughes, and Officer Daniel Bontempo also move for summary judgment as to all claims (Doc. No. 136).

_____

[1] Sweeney and Davis are or were employed by Glastonbury.  Berry, Hughes, Bontempo, and Koss are or were employed by Manchester.  Tyler and Gesualdi are or were employed by South Windsor.

II.    **FACTUAL BACKGROUND**[2]

This case arises from events that took place on the night of January 9, 2009, involving Morales and members of the East Central Narcotics Task Force ("ECNTF"), which was made up of several towns, including all three defendant towns, and officers from those towns.  On the night of January 9, an informant set up a drug bust in which Morales agreed to sell the informant 100 bags of heroin and to deliver the heroin at the Hilton Garden Hotel in Glastonbury that night.  On the night of January 9, 2009, Officer Bontempo was positioned with the informant off-site, while other ECNTF members, including Sergeant Hughes, Officer Davis, Officer Gesualdi, and Officer Koss, met at the Hilton Garden Hotel parking lot.

Morales got a ride to Glastonbury from Christopher Young.[3]  Morales briefly got out of Young's van, and then returned to the front passenger seat of the van and locked the door.  At that time, Koss was in a vehicle parked to the right of the van, Davis was in a vehicle parked to the left of the van, Hughes was in a vehicle behind the van toward the driver's side, and Gesualdi was in a separate vehicle behind the van toward the passenger's side.  After a brief time, Hughes gave an order to move in.

After giving the order to move in, Hughes pulled his vehicle up to the rear bumper of Young's van.  Hughes claims that he "tapped" the van and turned on his emergency lights.  See Defendants Town of Manchester, Berry, Hughes, and Bontempo's Local Rule 56(a)(1) Statement (Doc. No. 136-2) (hereinafter "Manchester Defs.' L.R. 56(a)(1) Stmt.") at ¶ 22 (citing Deposition of Marc Hughes (Doc. No. 136-3) at 34-35).  Morales

---

[2] Unless otherwise cited, the following facts are based upon the uncontested portions of the parties' Local Rule 56(a) Statements.

[3] Young does not seem to have been involved in the deal and is not a party to this case.

claims that the van was hit harder, and that there were no emergency lights.  See
Plaintiff's Local Rule 56(a)(2) Statement (Doc. No. 144-2) (hereinafter "Pl.'s Manchester
L.R. 56(a)(2) Stmt.") at ¶ 22 (citing Deposition of Rafael Morales (Doc. No. 144-3) at 55-
56).

     Upon Hughes's order, Gesualdi and Davis proceeded to the driver's side of the
van, guns drawn, and ordered Young to show his hands and exit the vehicle.  After
Young opened the driver's side door with some difficulty, Gesualdi and Davis ordered
him to the ground, patted him down, and handcuffed him.  Gesualdi and Davis claim
that they could not see what occurred between Koss and Morales.  See Defendants
Town of Glastonbury, Sweeney, Davis, Town of South Windsor, Tyler, and Gesualdi's
Local Rule 56(a)(1) Statement (Doc. No. 124) (hereinafter "Glastonbury and S. Windsor
Defs.' L.R. 56(a)(1) Stmt.") at ¶¶ 24-25.  Morales argues that Gesualdi and Davis would
have been able to see what was occurring on the passenger side of the van.  See
Plaintiff's Local Rule 56(a)(2) Statement (Doc. No. 141-2) (hereinafter "Pl.'s Glastonbury
and S. Windsor 56(a)(2) Stmt.") at ¶¶ 24-25.  After Gesualdi and Davis handcuffed and
secured Young, they went to the passenger's side of the vehicle, at which point they
saw that Morales was in handcuffs.

     The events on the passenger's side of the vehicle are hotly contested.  Upon
Hughes's order, Koss proceeded to the passenger's side of the van, gun drawn.
Manchester defendants claim that as Koss approached the van, he ordered Morales to
show his hands.  Manchester Defs.' L.R. 56(a)(1) Stmt. ¶ 23.  Morales both admits this
and also seems to deny it.  See Pl.'s Manchester L.R. 56(a)(2) Stmt. ¶ 23 (admitting
Defendants' statement); Pl.'s Manchester L.R. 56(a)(2) Stmt. of Disputed Facts ¶ 2

(asserting that Koss only "demanded that Morales get out of the van").  Morales showed

Koss his hands through the van's passenger window.  See Manchester Defs.' L.R.

56(a)(1) Stmt. ¶ 26.  Koss opened the passenger door.  Id.; Dep. of Rafael Morales at

63.

Defendants claim that, as Koss attempted to handcuff Morales, a struggle

ensued.  See Dep. of Rafael Morales (Doc. No. 144-3) at 26-27.  According to Koss,

Morales was sitting in the passenger seat, with his left hand handcuffed behind his

back, resisting with his right arm.  See Deposition of Steven Koss (Doc. No. 136-8) at

107.  Morales continued to resist, and Koss "gave him two empty-handed softening

blows to the side of his head to try and gain compliance of him.  At that point he gave

me his arm back, and I was able to handcuff him and take him out of the van."  Id.

Morales claims that, as the van door opened, he leaned forward to get out of the

van and Koss struck him on the head with an unidentified object.  See Pl.'s Manchester

L.R. 56(a)(2) Stmt. ¶ 26; Dep. of Rafael Morales at 63.  At his deposition, Morales

testified that, after he was struck, he moved back into the passenger side of the van.

Dep. of Rafael Morales at 70.  He further testified that, after he was hit, he remembers

only looking down at his leg before everything went pitch black, and that he did not

remember being taken out of the van, or anything that was said at that time.  Id. at 70,

75-76.  He testified that his next memory is lying face-down on the ground without

handcuffs, and that the three officers nearby brought him to his feet to handcuff him

when he "woke up."  Id. at 77.  Morales also submits an affidavit as part of his

Opposition to the instant motions, in which he testifies that, after the first blow to his

head, he was pulled out of the van by his legs.  See Affidavit of Rafael Morales (Doc.

4

No. 141-4) ¶¶ 8-9.  He further testifies that, "Officer Koss told me not to move and then struck me again in the left side of the head, and then I lost consciousness."  Id. at ¶ 9.

Officer Hughes testified that he did not observe any violence between Koss and Morales.  Hughes testified that he initially remained in his car, behind the van, from which he could not see Morales or Koss, but was able to observe Young being removed from the van.  Hughes then left his car and observed as Officers Gesualdi and Davis handcuffed Young.  Hughes claims that, while he was on the driver's side of the van, he heard Koss shouting "show me your hands" repeatedly, and "what sounded like a scuffle."  Manchester Defs.' L.R. 56(a)(1) Stmt. ¶ 30.  Hughes claims that he could not see what was happening on the passenger side of the van, and so he moved behind the van to the passenger side, where he saw Morales sitting in the passenger seat of the van, compliant, being handcuffed by Koss.  Manchester Defs.' L.R. 56(a)(1) Stmt. ¶¶ 31, 33.  Hughes then heard Koss tell Morales to get out of the van, which Morales did without resistance.  Hughes testified that he turned to walk back to the driver's side, but heard Morales fall to the ground, at which point Hughes saw Morales's head injury and told Davis to call for EMS.   Manchester Defs.' L.R. 56(a)(1) Stmt. ¶¶ 35-36.

Morales contests Hughes's whereabouts during certain portions of the events. Morales claims that Hughes was behind Koss on the passenger side of the van when Koss ordered Morales out of the van.  See  Pl.'s Manchester L.R. 56(a)(2) Stmt. ¶ 33; Dep. of Rafael Morales at 57-58.  Morales also claims that, after he was removed from the van and struck a second time, Hughes stood with Koss, and the latter said there was "too much blood."  Pl.'s Manchester L.R. 56(a)(2) Stmt. of Disputed Facts ¶ 10.

**III.    STANDARD**

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Fed.R.Civ.P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed.R.Civ.P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere "'scintilla'" of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

IV.     **DISCUSSION**

      A.     <u>Claims Against Officer Bontempo</u>

Morales does not contest the Motion for Summary Judgment as to his claims against Officer Bontempo.  <u>See</u> Plaintiff's Mem. in Opp'n to Mot. for Summ. J. by Town of Manchester, Berry, Hughes, and Bontempo (Doc. No. 144-1) (hereinafter "Pl.'s Mem. in Opp'n to Manchester Summ. J.") at 3.  Therefore, the Motion for Summary Judgment as to all claims against Officer Bontempo is **GRANTED**.

      B.     <u>Claims Against Officers Hughes, Davis, and Gesualdi</u>

Morales brings claims against remaining defendant officers under section 1983 of Title 42 of the United States Code, the Connecticut Constitution, and Connecticut common law.

          1.     Section 1983 Claim

Hughes, Davis, and Gesualdi all argue that Morales's claims under section 1983 must fail because they were not personally involved in the physical encounter with Morales, nor did they observe any violation of Morales's rights.  Mem. of Law in Supp. of Defendants Town of Manchester, Berry, Hughes, and Bontempo's Mot. for Summ. J. (Doc. No. 136-1) (hereinafter "Manchester Defs.' Mot. for Summ. J.") at 2; Defendants Town of Glastonbury, Sweeney, Davis, Town of South Windsor, Tyler, and Gesualdi's Mem. of Law in Supp. of Mot. for Summ. J. (Doc. No. 125) (hereinafter "Glastonbury and S. Windsor Defs.' Mot. for Summ. J.") at 10-12.  Hughes, Davis, and Gesualdi argue that they lacked a reasonable opportunity to intervene to prevent any violation of Morales's rights.  <u>See</u> Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 6; Manchester Defs.' Mot. for Summ. J. at 10-12.  Finally, the officers argue that they are

entitled to qualified immunity.  See Glastonbury and S. Windsor Defs.' Mot. for Summ.

J. at 9; Manchester Defs.' Mot. for Summ. J. at 10-12.

a.    Personal Involvement and Opportunity to Intervene

As the Glastonbury and South Windsor defendants correctly point out, a plaintiff

proceeding under section 1983 must "allege a tangible connection between the acts of a

defendant and the injuries suffered."  Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.

1986).

Under the Fourth Amendment right to be free from use of excessive force in the

course of search or arrest, police officers "have an affirmative duty to intercede on the

behalf of a citizen whose constitutional rights are being violated in their presence by

other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988).  "An officer who fails

to intercede is liable for the preventable harm caused by the actions of the other officers

where that officer observes or has reason to know . . . that excessive force is being

used." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (internal citations omitted).

Because of the officers' duty to intercede, Morales's section 1983 claims do not fail as a

matter of law merely because defendant officers were not "personal[ly] involve[d] in the

struggle with the plaintiff."  Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 2.

Instead, liability hinges on whether the officers had an opportunity to intervene.

Whether an officer had a "realistic opportunity to intervene to prevent the harm from

occurring" is a "question of fact for the jury unless, considering all the evidence, a

reasonable jury could not possibly conclude otherwise."  Anderson, 17 F.3d at 557; see

also Betancourt v. Slavin, 676 F. Supp. 2d 71, 78 (D. Conn. 2009).

Hughes asserts that "the undisputed facts preclude the conclusion that [he] had a reasonable opportunity to intervene." Manchester Defs.' Mot. for Summ. J. at 13. Davis and Gesualdi make a similar claim, and add that "an officer is excused from liability, despite his presence, if the assault is 'sudden and brief,' such that there is no real opportunity to prevent it." Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 7 (citing Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 129 (2d Cir. 1997)).

Hughes relies on his own deposition testimony, in which he asserts that the first time he saw Morales was after the struggle between Morales and Officer Koss, at which point Morales was being handcuffed. See Glastonbury and S. Windsor Defs.' L.R. 56(a)(1) Stmt. ¶¶ 30-31; Deposition of Marc Hughes (Doc. No. 136-3) at 40-43. Davis and Gesualdi also testified that they did not observe what occurred between Koss and Morales. See Glastonbury and S. Windsor Defs.' L.R. 56(a)(1) Stmt. ¶¶ 24, 25.[4] Hughes also cites Morales's deposition testimony, in which Morales recounts being struck once and losing consciousness, Manchester Defs.' L.R. 56(a)(1) Stmt. ¶ 37 (citing Dep. of Rafael Morales at 74-75), thus indicating a situation where there is no opportunity to intervene.[5]

In response, Morales cites his own affidavit to assert that he was struck twice: once as soon as he opened the van's passenger door, and a second time after he was

---

[4] Morales denies this, asserting that Davis "was only a few feet away from Koss and Morales with both doors open, and would have been able to see the interaction between Koss and Morales through the van." Pl.'s Glastonbury and S. Windsor 56(a)(2) Stmt. ¶ 24. Morales cites the deposition of Corey Davis, in which Davis testified that he heard "a loud thump on the other side, so [he] assumed there was some kind of struggle going on," but that by the time he got to the passenger side of the vehicle, Morales was handcuffed and standing up. Deposition of Corey Davis (Doc. No. 141-5) at 34-35. Morales also denies Gesualdi's claim not to have observed any struggle, but instead of citing to the record, Morales argues that "[a] jury could reasonably find that Gesualdi saw Morales and Koss in spite of Gesualdi's testimony." Pl.'s Glastonbury and S. Windsor 56(a)(2) Stmt. 25.

[5] Morales also testified that he was struck once at another point in his deposition testimony. See Dep. of Rafael Morales at 113.

removed from the van.  See Pl.'s Manchester L.R. 56(a)(2) Stmt. ¶ 37 (citing Aff. of Rafael Morales at ¶¶ 8-9); Pl.'s Glastonbury and S. Windsor 56(a)(2) Stmt. of Disputed Facts ¶¶ 6-8 (citing Aff. of Rafael Morales at ¶¶ 8-9).  Morales also testified that he observed an officer behind Koss when he was first ordered out of the van and before any physical encounter took place, which suggests that Hughes could have observed the altercation.[6]  See Dep. of Rafael Morales at 57-58.  By all parties' accounts, immediately after Hughes gave the order to move in, Davis and Gesualdi were on the driver's side of the van and Koss was on the passenger side of the van.  Hughes claims that he remained in his car until he joined Davis and Gesualdi on the driver's side of the van.  The court is bound, however, to credit Morales's testimony that he saw another officer behind Koss, and to draw the reasonable inference that the officer was Hughes.

If Morales's deposition is credited but his affidavit is not credited, Koss struck Morales once, suddenly, giving defendant officers no realistic opportunity to intervene. See, e.g., Maye v. Vargas, 638 F. Supp. 2d 256, 263 (D. Conn. 2009) (granting summary judgment to officer who was a passenger in a police car that hit plaintiff's car and therefore had no opportunity to intervene before the collision occurred); Lupinacci v. Pizighelli, 588 F. Supp. 2d 242, 250-51 (D. Conn. 2008) (granting summary judgment to bystander officers who had no realistic opportunity to intercede where plaintiff was tackled and arrested suddenly and without warning).  If Morales's affidavit is credited, however, time elapsed between the first and second strikes, potentially giving defendant officers an opportunity to intervene, at least verbally.  Therefore, the court must decide how to treat the apparent conflict between Morales's deposition testimony that he was

---

[6] There was no officer other than Hughes on the scene who was not occupied with handcuffing either Young or Morales.

struck once and his affidavit stating he was struck twice in order to determine whether any of the officers might have had an opportunity to intervene.

Although the court may not resolve factual disputes or make credibility determinations in ruling on summary judgment, "[t]he Second Circuit 'follow[s] the rule that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" Carone v. Mascolo, 573 F. Supp. 2d 575, 582 (D. Conn. 2008) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997)); see also Betancourt v. Slavin, 676 F. Supp. 2d 71, 75 (D. Conn. 2009) ("A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements."). "Moreover, factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). The Second Circuit has recognized that, under certain circumstances, the court should consider a later sworn statement that seems to contradict prior deposition testimony, and deny summary judgment. See, e.g., Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000) (listing examples of such circumstances).

At oral argument, Morales argued that the court should consider his affidavit as supplementary to his deposition testimony in light of the traumatic brain injury that resulted from the events underlying this case, which affected his memory. The court ordered Morales to file under seal his expert's report on his traumatic brain injury, see Order (Doc. No. 150), and Morales complied. See Expert Report (Doc. No. 151).

Despite the court's invitation, see Order (Doc. No. 150), neither party submitted briefing on the admissibility of Morales's affidavit in light of the expert's report.

The report included the conclusion that Morales's memory was affected by the accident, and that post-accident test results suggested "moderate to severe deficits in attention/concentration, which will likely significantly impact his short-term memory." Expert Report at 3.  The report also noted Morales's "severe distractibility and forgetfulness."  Expert Report at 7.  The expert concluded that persistent results from Morales's injury include "very significant decline in overall intellectual functioning, impaired processing speed and diminished auditory working memory."  Expert Report at 9.   In light of the contents of the report, the court will credit the contents of Morales's affidavit in deciding the Motions for Summary Judgment.

In light of Morales's affidavit, the court must determine whether a reasonable juror could conclude that any of the officers knew or had reason to know whether excessive force was being used and had the opportunity to intercede to prevent Koss from striking Morales a second time.

i.    Officers Davis and Gesualdi.  Davis and Gesualdi each testified that they did not observe any physical interactions between Koss and Morales because they were focused on handcuffing Young.  See Aff. of Corey Davis (Doc. No. 124-1) at 34, 54; Aff. of David Gesualdi (Doc. No. 124-4) at 50; see also Glastonbury and S. Windsor Defs.' L.R. 56(a)(1) Stmt.  at ¶¶ 24-25.[7]  In addition to arguing that Davis and Gesualdi could have seen the interaction between Koss and Morales, Morales argues that Davis

---

[7] Morales denies these statements and argues that the officers would have been able to see Koss and Morales, but does not cite any evidence contradicting the officers' testimony.  See Pl.'s Glastonbury and S. Windsor L.R. 56(a)(2) Stmt. ¶¶ 24-25.

and Gesualdi knew or should have known that his constitutional rights were being violated because they heard sounds indicating a struggle.  <u>See</u> Pl.'s Opp'n to Glastonbury and S. Windsor Defs. Mot. for Summ. J. at 5; <u>see also</u> Dep. of Corey Davis (Doc. No. 141-5) at 34 ("When I was on the ground handcuffing the driver, I heard a loud thump on the other side, so I assumed there was some kind of struggle going on."). Sounds of struggle at an arrest, however, do not indicate or even suggest that constitutional rights are being violated.  Further, at the time the struggle sound was heard, Davis was on the ground and was not available to intervene.  Because the undisputed facts show that Davis and Gesualdi did not observe any constitutional violations and had no reason to expect Morales to be struck a second time or to know of any constitutional violation, they cannot be liable for failure to intercede.

ii.     <u>Officer Hughes</u>.  Hughes contends that the first time that he approached the passenger side of the van was after Young was handcuffed, at which point Morales was compliant.  <u>See</u> Dep. of Marc Hughes (Doc. No. 136-1) at 42-43.  Morales testified at his deposition that he saw an officer "circulating" behind Koss when Koss first approached the van.  <u>See</u> Dep. of Rafael Morales at 57.  As Morales argues in his Opposition, the whereabouts of all other officers at the scene at the beginning of the arrest are uncontested.  <u>See</u> Pl.'s Mem. in Opp'n to Manchester Summ. J. at 9; <u>see also</u> <u>supra</u> n.6.  Making all inferences in Morales's favor, Hughes was in close proximity to Morales and Koss, and Hughes could have observed the first blow.  Therefore, Hughes could have known that excessive force was being used against Morales, and a reasonable jury could find Hughes liable for failure to intercede between Koss's first and second blow to Morales's head.

b.      Qualified Immunity

Officer Hughes argues that, even if he is not entitled to summary judgment because he had an opportunity to intervene, he is nonetheless entitled to summary judgment based on his qualified immunity from such claims.[8]  Manchester Defs.' Mot. for Summ. J. at 15.  Police officers are entitled to judgment in their favor on constitutional claims if they did not violate clearly established rights about which a reasonable officer would have known.  Jones v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006); Maye v. Vargas, 638 F. Supp. 2d 256, 261-62 (D. Conn. 2009).  "Although qualified immunity is a question of law, because issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted."  Maye, 638 F. Supp. 2d at 262 (citing Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007)).  The disputed facts that make summary judgment on failure to intervene inappropriate as to Hughes also preclude summary judgment on qualified immunity as to Hughes.  If, as Morales claims, after Hughes watched as Koss struck Morales on the head, and then watched and did nothing as Koss pulled Morales out of the car by his legs and struck Morales on the head again, Hughes would not be entitled to qualified immunity.

Therefore, Officers Davis and Gesualdi's Motion for Summary Judgment is **GRANTED** as to Morales's claims under section 1983.  Officer Hughes's Motion for Summary Judgment is **DENIED** as to Morales's claim under section 1983.

---

[8] It does not appear that Davis and Gesualdi make this argument.  Because the constitutional claims against them do not survive summary judgment, the court need not address the issue.

2.      Connecticut Constitutional Claims

Morales alleges that the officers violated rights protected by Article First, sections seven and nine of the Connecticut Constitution.[9]  See Third Am. Compl. (Doc. No. 55) at 7.  Davis, Gesualdi, and Hughes argue that these claims should fail because the officers were not personally involved in the use of force alleged.  See Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 4; Manchester Defs.' Mot. for Summ. J. at 22.

In Binette v. Sabo, 244 Conn. 23 (1988), the Connecticut Supreme Court recognized a private right of action for money damages stemming from violations of Article First, sections seven and nine of the Connecticut Constitution.  See Binette, 244 Conn. at 45-46.  In that case, the plaintiffs alleged that police officers entered their home without a warrant, pushed one plaintiff down, and repeatedly slammed the head of the other plaintiff against a car and later struck him on the head and kicked him while he was lying on the ground experiencing an epileptic seizure.  Binette, 244 Conn. at 26.

a.      Section Seven

Section seven of the Connecticut Constitution protects against unreasonable searches and seizures and against unreasonable use of force in arrests.  Carey v. Maloney, 480 F. Supp. 2d 548, 561 (D. Conn. 2007).  Connecticut courts have interpreted Binette to allow a private right of action for damages under section seven of the first article of the Connecticut Constitution for claims analogous to excessive force claims brought under the Fourth Amendment to the United States Constitution.  See, e.g., id. ("It appears that, like the Fourth Amendment of the United States Constitution,

---

[9] The Complaint also makes a claim pursuant to Article First, Section 8 of the Connecticut Constitution, but the parties do not address that claim, and at oral argument, Morales represented that he was not pursuing any claim under Section 8 of the Connecticut Constitution.

[section seven of the Connecticut Constitution] protects against unreasonable use of force in effecting arrests.").  Where plaintiffs have alleged excessive force claims under both section 1983 and <u>Binette</u>, Connecticut courts have analyzed the two claims analogously.[10]  <u>See id.</u>; <u>see also</u> <u>Zainc v. City of Waterbury</u>, 603 F. Supp. 2d 368, 379 n.3 (D. Conn. 2009).

For the same reasons that summary judgment as to Hughes was denied on Morales's claims under section 1983, summary judgment is **DENIED** as to Hughes on Morales's claims pursuant to section seven of Article First of the Connecticut Constitution.  Because the court has found that Morales cannot sustain his section 1983 claims against Officers Davis and Gesualdi, summary judgment is **GRANTED** as to his claims against them pursuant to section seven of Article First of the Connecticut Constitution.

b.      Section Nine

Section Nine protects against false arrest.  <u>See</u> <u>Carey</u>, 480 F. Supp. 2d at 562.  Morales has not introduced any evidence of false arrest or even alleged that the officers arrested him without probable cause.  Therefore, summary judgment is **GRANTED** as to Davis, Gesualdi, and Hughes on the claims pursuant to Section Nine of the Connecticut Constitution.

3.      Common Law Claims

_____

[10] For the purpose of analysis under section 1983, Morales's allegation that Hughes failed to intercede constitutes an allegation of excessive force.  <u>See, e.g.</u>, <u>Zainc v. City of Waterbury</u>, 603 F. Supp. 2d 368, 384 (D. Conn. 2009) ("A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." (internal citations omitted)).

Morales alleges that the officers' conduct constituted the following torts: assault and/or battery; intentional infliction of emotional distress; recklessness; negligent infliction of emotional distress; and negligence.  Third Am. Compl. 9.  The parties agree that the facts do not support claims of assault, battery, intentional infliction of emotional distress, recklessness, or negligent infliction of emotional distress against Officers Davis, Gesualdi, or Hughes.  See Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 14-20; Plaintiff's Mem. in Opp'n to Glastonbury and S. Windsor Defs.' Mot. for Summ. J. (Doc. No. 141-1) at 11-12; Manchester Defs.' Mot. for Summ. J. at 24-29; Pl.'s Mem. in Opp'n to Manchester Summ. J. at 14.  Therefore, summary judgment is **GRANTED** in favor of Officers Davis, Gesualdi, and Hughes on the claims of assault, battery, intentional infliction of emotional distress, recklessness, and negligent infliction of emotional distress.

Davis, Gesualdi, and Hughes make several arguments as to why Morales's negligence claim against them should fail as a matter of law.  They argue that Morales fails to present evidence to support two elements of a negligence claim: duty and causation.  See Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 11-12; Manchester Defs.' Mot. for Summ. J. at 28-29.  Morales responds that the officers had a duty to intercede, the breach of which caused his injuries.  Pl.'s Mem. in Opp'n to Glastonbury and S. Windsor Summ. J. at 9-10; Pl.'s Mem. in Opp'n to Manchester Summ. J. at 12-13.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury."  RK Constructors v. Fusco Corp., 231 Conn. 381, 384 (1994).  The existence of a duty is a question of law.  Petriello v.

17

Kalman, 215 Conn. 377, 382-83 (1990).  As discussed above, law enforcement officers have a duty to intervene, which can create liability only when an officer has a realistic opportunity to intervene.  See Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).  In this case, the court has found no evidence on which a jury could find that Davis and Gesualdi had an opportunity to intervene.  See supra at 8-10.  Therefore, summary judgment is **GRANTED** in favor Davis and Gesualdi on Morales's negligence claim.

Hughes argues that the negligence claim against him must also fail for lack of proximate causation.  Manchester Defs.' Mot. for Summ. J. at 29.  "In negligence cases such as the present one, in which a tortfeasor's conduct is not the direct cause of the harm, the question of legal causation is practically indistinguishable from an analysis of the extent of the tortfeasor's duty to the plaintiff."  First Fed. Sav. and Loan Ass'n v. Charter Appraisal Co., 247 Conn. 597, 604 (1999).  Because the court has found that a jury must resolve disputed issues of fact as to Hughes's opportunity to intervene, it cannot now grant summary judgment as to Hughes's negligence.  If a jury were to find that Hughes had an opportunity to intervene and prevent further harm to Morales, it could also find that Hughes's failure to intervene breached his duty to intercede, and that breach was the proximate cause of the injury to Morales.  See, e.g., Woodmansee v. Mickens, No. 04-CV-1896(WWE), 2007 WL 1576152 at *3 (D. Conn. May 30, 2007) (denying summary judgment on a negligence claim when factual disputes existed as to failure to intervene).

Hughes argues that summary judgment should nonetheless be granted in his favor because he is immune from such claims.[11]  Manchester Defs.' Mot. for Summ. J. at 31.  Morales contends that one of the established exceptions to governmental immunity applies.  Pl.'s Mem. in Opp'n to Manchester Summ. J. at 12-13.

Connecticut common law recognizes governmental immunity for municipal employees "for governmental acts involving the exercise of judgment or discretion." Elliott v. City of Waterbury, 245 Conn. 385, 411 (1998); see also Gilliam v. Town of Windsor Locks, 3-CV-1201(AVC), 2006 WL 581208 at *9 (D. Conn. Mar. 7, 2006). The immunity applies to discretionary acts, as opposed to "ministerial acts which [are] to be performed in a prescribed manner without the exercise of judgment or discretion."  Id. (internal citations omitted).  The "great weight of authority [holds] that the operation of a police department is a discretionary governmental function."  Gordon v. Bridgeport Hous. Auth., 208 Conn. 161, 179 (1988).  Governmental immunity is subject to several established exceptions, including "where the circumstances make it apparent to the municipal employee or agent that his or her failure to act would be likely to subject an identifiable person to imminent harm."  Evon v. Andrews, 211 Conn. 501, 505 (1989). In determining whether this exception applies, Connecticut courts consider three factors: whether there is "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm."  Doe v. Petersen, 279 Conn. 607, 616 (2006).

---

[11] Hughes seems to assert that he is immune from the negligence claim under Conn. Gen. Stat. § 52-557n(a)(2)(B).  See Manchester Defs.' Mot. for Summ. J. at 31-32.  The portion of the statute cited applies to the immunity of municipalities only.

Assuming, for the purpose of deciding whether summary judgment is appropriate as to the negligence count against Hughes, that Morales suffered from excessive force and Hughes had an opportunity to intervene, the three-factor test is clearly met: Morales was an identifiable victim; he was subject to imminent harm; and Hughes was a public official to whom it was apparent that his failure to intervene was likely to subject Morales to further harm.  See Carey v. Maloney, 480 F. Supp. 2d 548, 559-560 (D. Conn. 2007). Morales's negligence allegations against Hughes fit squarely within one of the exceptions to governmental immunity for discretionary acts.  Therefore, summary judgment is **DENIED** as to the negligence claim against Officer Hughes.

      C.      Claims Against the Towns and Chiefs

         1.     Section 1983 Claims

Morales alleges that the Towns of Glastonbury, Manchester, and South Windsor, and their police chiefs[12] had "actual and de facto policies, practices, and customs" including, inter alia, the failure to control officers' use of force and the failure to properly train and supervise officers' use of force.  Third Am. Compl. 9.  Defendants argue that Morales has failed to produce any evidence to support such a claim.  Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 21; Manchester Defs.' Mot. for Summ. J. at 20.

---

[12] Claims against the police chiefs in their official capacity are treated as claims against the towns.  See Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004); Seri v. Town of Newtown, 573 F. Supp. 2d 661, 671 (D. Conn. 2008).  Therefore, the court addresses these counts as claims against the towns.

      The Complaint also names the chiefs in their individual capacities, but makes no allegations as to their direct or personal involvement.  Neither Motion for Summary Judgment makes any argument about the liability of the chiefs in their individual capacity, and plaintiff's counsel admitted at oral argument that he had no evidence of personal involvement by any of the chiefs.  Because "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under section 1983," the claims against the chiefs in their individual capacities cannot be sustained.  Patterson, 375 F.3d at 229.

"A plaintiff pursuing a section 1983 claim against a municipality must demonstrate that his or her constitutional injury resulted from the employee's execution of an unconstitutional official policy or practice." Seri v. Town of Newtown, 573 F. Supp. 2d 661, 666 (D. Conn. 2008).   "[T]he inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989).  Plaintiffs alleging failure to train must identify a specific deficiency in the training program and establish that the deficiency actually caused the constitutional deprivation.  See Amnesty America v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004).  If such a claim is to survive a motion for summary judgment, the plaintiff must offer evidence of the specific deficiency and the causal relationship.  See id. at 130 n.10 ("After discovery, on the other hand, a plaintiff is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation."); see also Carey v. Maloney, 480 F. Supp. 2d 548, 565-66 (D. Conn. 2007) (finding insufficient evidence for plaintiff to avoid summary judgment on a claim of failure to train).

Morales summarily alleges the elements of a claim for failure to train with respect to the Glastonbury and Manchester defendants.[13]  See Pl.'s Mem. in Opp'n to Glastonbury and S. Windsor Summ. J. at 13-14; Pl.'s Mem. in Opp'n to Manchester Summ. J. at 16 (towns were "deliberately indifferent . . . and . . . put into place a de facto

---

[13] Morales does not make this argument in opposing South Windsor defendants' Motion for Summary Judgment.  See Pl.'s Mem. in Opp'n to Glastonbury and S. Windsor Summ. J. at 13-14.  At oral argument on the Motions for Summary Judgment, plaintiff's counsel explained that this was an oversight, and offered the same argument with respect to the South Windsor defendants.

policy of failing to train Manchester police officers on [their duty to intervene, which was] the  direct and proximate cause of Rafael Morales's severe injuries, because officers were faced with the difficult choice of [whether to stop Koss] . . . which training would have made less difficult").  Morales concludes that a jury could find deliberate indifference and causation.  See Pl.'s Mem. in Opp'n to Glastonbury and S. Windsor Summ. J. at 13-14; Pl.'s Mem. in Opp'n to Manchester Summ. J. at 16.  Throughout his recitation of the elements, Morales makes no citations to his Local Rule 56(a)(2) statement or to any part of the underlying record.

The court's examination of the portions of the record submitted in conjunction with these Motions reveals no evidence whatsoever regarding the training programs, customs or policies of the towns or chiefs, nor any facts or allegations concerning the training of officers on use of force.  Without any evidence regarding training, policy, or custom of defendant towns or chiefs, summary judgment on the section 1983 claims must be **GRANTED** in favor of the Towns of Glastonbury, South Windsor, and Manchester, and Chiefs Sweeney, Tyler, and Berry.  The court therefore need not address governmental immunity.

2.      Connecticut Constitutional Claims

Morales alleges that the defendant towns and their police chiefs failed to supervise and train police officers in violation of Article First, sections seven and nine of the Connecticut Constitution.[14]  See Third Am. Compl. at 9.  The parties do not make any arguments about the liability of the towns under the Connecticut Constitution. Because the Motions for Summary Judgment urge the court to grant summary judgment with respect to all claims, the court takes up this question briefly.

The court cannot locate any authority in the Connecticut case law recognizing municipal liability for violations of sections seven or nine of Article First of the Connecticut Constitution.  In Seri v. Town of Newtown, 573 F. Supp. 2d 661 (D. Conn. 2008), a plaintiff brought Binette claims against a municipality and argued that such claims should be permitted by analogy to Monell v. Dep't of Soc. Serv., 436 U.S. 658 (1978).  Seri, 573 F. Supp. 2d at 670.  The court concluded that, because the plaintiff had failed to establish a viable Monell claim, it "need not reach the question whether the Connecticut courts would recognize a similar claim against municipalities for violations of the Connecticut Constitution because that claim would also fail for [the same reasons]."  Seri, 573 F. Supp. 2d at 670.  Similarly, in this case, because Morales has failed to support his claim for municipal liability for violations of the U.S. Constitution, the court need not decide whether Connecticut courts would recognize an analogous claim under the state constitution.

_____

[14] The Complaint also mentions Article 8, but Morales does not pursue this claim.  See supra n.9.

23

      3.     State Statutory Liability

The fourth count of the Complaint alleges that defendant towns are liable to Morales under Conn. Gen. Stat. Section 52-557n and Conn. Gen Stat. Section 7-465. See Third Am. Compl. 10.

      a.     Conn. Gen. Stat. Section 52-557n

Both Motions for Summary Judgment address defendants' immunity pursuant to Conn. Gen. Stat. Section 52-557n, but neither addresses Morales's apparent assertion of the statute as an independent basis for liability. See Third Am. Compl. at 10 ("The Defendant Towns are liable to the Plaintiff in accordance with . . . Conn. Gen Stat. § 52-557n in that municipal employee(s) negligence caused damage to the Plaintiff").

Connecticut General Statute section 52-557n(a)(1) provides in part that, "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . ."  Section 52-557n(a)(2)(B) "extends, however, the same discretionary act immunity that applies to municipal officials to the municipalities themselves by providing that they will not be liable for damages caused by negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Violano v. Fernandez, 280 Conn. 310, 320 (2006).

Because the court has granted summary judgment as to the negligence claims against Davis and Gesualdi, there remains no basis for a section 52-557n claim against the Towns of Glastonbury and South Windsor, Officers Davis and Gesualdi and Chiefs

24

Sweeney and Tyler, and summary judgment is **GRANTED** in their favor on this claim. Because negligence claims remain against Hughes and Koss, summary judgment is **DENIED** as to the Town of Manchester.

b.        Conn. Gen Stat. Section 7-465

Defendant towns argue that they are not liable under section 7-465 because Morales has not established liability against any of their employees, and that such a predicate finding is required to impose liability. See Glastonbury and S. Windsor Defs.' Mot. for Summ. J. at 24; Manchester Defs.' Mot. for Summ. J. at 33. Morales does not respond to this argument.

Section 7-465 provides that municipalities shall pay on behalf of employees whose negligence is found to have caused damages by infringing on a person's civil rights, person, or property. See Conn. Gen. Stat. § 7-465(a). A plaintiff bringing suit under this statute "first must allege in a separate count and prove the employee's duty to the individual injured and the breach thereof. Only then may the plaintiff go on to allege and prove the town's liability by indemnification." Sestito v. Groton, 178 Conn. 520, 527 (1979) (emphasis in original). Therefore, claims pursuant to section 7-465 survive only to the extent that the corresponding claims against a municipality's employees survive.

Because summary judgment has been granted as to all claims against the employees of Glastonbury and South Windsor, summary judgment is also **GRANTED** as to the liability of those towns pursuant to section 7-465. Because negligence claims remain against Hughes and Koss, summary judgment is **DENIED** as to the Town of Manchester.

25

**V.     CONCLUSION**

For the reasons discussed above, the Glastonbury and South Windsor Defendants' Motion for Summary Judgment (Doc. No. 123) is **GRANTED** as to all claims against Town of Glastonbury, Chief Thomas J. Sweeney, Officer Corey Davis, Town of South Windsor, Chief Gary T. Tyler, and Officer David Gesualdi, and the Manchester Defendants' Motion for Summary Judgment (Doc. No. 136) is **GRANTED** with respect to all claims against Officer Bontempo, and **GRANTED IN PART** with respect to Officer Hughes and the Town of Manchester.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 17th day of January, 2012.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge